Good morning, Your Honors. May it please this Court. My name is Timothy Adams, the firm of Roberts and Adams. I'm here to represent the appellant. That would be B.S., a student. With this, what I'd like to do is summarize the information that we've already provided to this Court, along with excerpts of record, and give the Court an opportunity to question with whatever clarification questions that you have. I'd like to begin by clarifying that my client, B.S., is a student with autism who attends a school in the Placentia-Yorba Linda Unified School District. He's been a student in that district since he was three years old. When this dispute began, he was in third grade. And he remained eligible for special education services. And I, my colleague, Ms. Whiteleather, and Mr. Clark had spent some time talking about the Individuals with Disabilities Education Act. On March 22, 2004, the district convened its Triennial Individualized Education Program meeting. That is a three-year review meeting. Typically, there's assessments that are performed. The district had assessments to present and information to provide at that triennial meeting. That was to discuss and review what the district considered a free, appropriate public education offer for the 2004-2005 school year. Let me ask you about the 2000-2004-5. You said it did not provide B.S. with a free, appropriate public education. But your evidence is from the summer of 2005 under Adams v. Oregon. Aren't we bound to examine the IEP at the time it was drafted and not in hindsight? Well, Your Honor, looking at Adams, there is a snapshot rule that this Court had discussed. However, parents can't anticipate that there would be a dispute. And they don't often see whether the child is going to make progress until the end of the school year. The question is, if the time is drafted, is it not? And you cannot say, well, it didn't work out. Well, yes, you can, Your Honor, because if the child fails to make a meaningful progress in the program, which, as this Court also said in Adams v. Oregon, it's the district's obligation, it's the district's duty to ensure that they develop a program that allows the child to meaningful progress, then we do have concerns about whether the program was uniquely tailored to the individual needs of that child. So when the pretesting was performed by the Linda Moobell private agency, and it showed that there had been de minimis progress in the district's program during the 2004-05 school year, it was very clear that something needed to change, that we needed to... Well, that may well be true, but that's after the fact. And we're asking, did they provide it at the time it was drafted? We do not believe that they did, Your Honor. We do not believe, based on his performance and the scores that we received after the school year had ended, that his performance, his performance, what he made de minimis progress. And again, as I mentioned, Your Honor, respectfully, Adams v. Oregon also discusses the district's legal obligation to provide that meaningful educational benefit. So at times, if we do try something, and there was information in advance, you know, the district's, you know, as they say, as my colleague, Mr. Larson, has discussed in his brief, they talk about how many of these educators had known him since he was three years old. So they knew what his needs were. However, unfortunately, as we pointed out in our briefs, that they did not address it with an appropriate method of instruction. And that appropriate method of instruction was clear, based on the objective data that we saw from Lin-Bubel testing, that that was the method that worked for him. Okay. Since your time is limited, rather than have you go through the whole thing that we've already read, let me ask you about the 2005-2006 placement. You argue that B.S.'s placement in the S.D.C. for 90 minutes a day was not the least restrictive environment for him, and that he had to have been mainstreamed with an aide. How does that fit in with your request that instead, B.S. be placed in four hours of one-on-one LMB education, which would be more restrictive than the 90 minutes of S.D.C.? Well, Your Honor, there's a couple ways we can answer that. One is that the services that Lin-Bubel had made a recommendation for could be picked up. And as we see, as was presented in our briefs, we see that he only participated in a portion of the Lin-Bubel recommendation, and he made tremendous progress, shown by the objective data that was presented that's in the excerpts of record. So he could have participated in part of this program after school. He could have participated in part of it during school. It's up to the IEP team to determine when is the most appropriate time when he could have been removed. For example, the district was proposing to remove him to put him in a special day class perhaps. And I will point out, Your Honor, that my understanding is the district does have its own version of Lin-Bubel. Perhaps they could have pulled him out and put him in a Lin-Bubel-like program, rather than putting him in a very restrictive S.D.C. class. They commonly do that, Your Honor. Looking at the L.M.B. in the context of the 2005-2006 school year, there was conflicting evidence as to whether or not B.S. had benefited from the 2004-05 placement. Your position, as you express, is that he did benefit. But there was a conflict. And here we have to look to our standard of compliance. Yes. If that ALJ provided a complete record and had enough information, elicited enough information from the witnesses, did not commit, you know, we should be giving him due weight if he did not commit clear error. But he did not apply appropriate laws, including Rachel Holland tests. That wasn't even mentioned in his decision. He applied the wrong standard in terms of a faith standard. He applied the Rowley standard as opposed to the Adams v. Oregon standard of meaningful benefit. And based upon, he got some of the facts right, but some of it was also incomplete. And it seems that he completely deferred to all the school district witnesses, finding them almost 100 percent credible, even one of the witnesses, their sole true expert, Michelle Garcia-Winner, who merely saw this child five or, excuse me, saw this child's records, not even the child, five days before she testified. And supposedly she was the star witness in their trial, and he hinged his decision based on somebody that never met him, never assessed him, never worked with him, and only met him, excuse me, only reviewed records, maybe even on a plane when she was flying down from her office. You know, I don't understand, it doesn't make sense how that would, that would be the crux of their case. Thank you.  Thank you, Your Honors. Good morning. Police, the court. David Larson on behalf of Placentia-Roberta Unified School District. I believe counsel misspoke when he said the administrative law judge was not aware of the Rachel H. case or did not mention it or the Adams case. If you were to look at his decisions under the number six, he specifically references the Rachel H. case, and under number nine, he specifically references the Adams case. That being said, we also have a very detailed review by the district court in this case, and the district court did a rather detailed factual analysis itself in terms of Adams and Rachel H. case. This court's standard of review is one of clear and present error on those factual issues. That being said, this was a fairly complex case. It took over eight days of testimony. There were a number of very well-qualified individuals who provided testimony. That testimony supported the fact that this young man was getting meaningful educational benefit in a very comprehensive program, a 43-hour-a-week program, that when we got to the 05-06 year and the question of whether or not we should somehow provide him four hours a day of Linda Mood Bell, which frankly was questionable, because both the RSP teacher in September of 05, the beginning of the 05-06 year, and the RSP teacher in September of 05, the speech and language specialist, Ms. Hooper, or Dr. Hooper, who worked with him four hours a week, neither could see any actual transposition, if you will, of that strategy. In other words, while he had been programmed to a certain extent and perhaps performed on a very limited cadre of standardized tests, when it came to functioning in the classroom as a result of that, he was showing no actual evidence of having benefited from that. Both of those individuals testified that, in fact, well, that he did get benefit from, and there was substantial evidence, by all across the board, special teachers, regular education teachers and speech and language specialists, as well as the plaintiff's own experts. And the plaintiff's own experts, or the petitioner's own experts, they all testified that, yes, there was significant benefit. But coming back to the program itself, when we specifically asked those that were recommending Linda Mood Bell, Dr. Davidson, Christine Bowman, and Ms. Zakarian, how that would interface with this comprehensive program, 43-hour-a-week program that this young man had, and how that would be used in the classroom, and how that would be used in the classroom, none of them could identify what we would move out of place, what we would give up. And, in fact, we know that from the experience of Linda Mood Bell, just with math alone, that the concentration in that one summer cost him progress that he had already made in another area. I don't, I believe our case is well set forth in our briefs. I'm not going to reiterate it in any great detail. Let me just close with the ultimate final finding by the administrative law judge in the last sentence of his decision. The student needs a comprehensive, collaborative program that coordinates all areas of service for student needs. The district program is designed to do that. This was a young man with substantial needs. This was a school district that paid very close attention to those with substantial needs, and frankly provided its brightest and its best to assist that student. That student made substantial and meaningful educational progress. One last comment with respect to the exhaustion issue. I would like to, and I don't know if it was clear enough in our briefs, just make it clear to the court that that whole issue came up after the district had rested. That was not ever presented as an issue. You have to remember that this was a hearing that took place in the summer when people were not otherwise available except for with significant advanced planning, and so it was neither, evidence was not produced, argument was not made, and we were not given the benefit of all of the preliminary procedures that proceed with respect to that type of an issue. Thank you. Any rebuttal? I'd just like to discuss, Mr. Larson pointed out that there was mention of the racial age and the Adams v. Oregon standard. There was only mention of it, no discussion, no analysis. In excerpt of record 36, this is the administrative lodger's decision paragraph number 6, he does not cite it, doesn't discuss racial age at all, doesn't apply the factors, doesn't discuss how they apply to Brandon, excuse me, B.S. with respect to his program. With regard to the Adams v. Oregon, he applies it or discusses it only with the exception of the snapshot rule, does not discuss it in light of the meaningful benefit standard whatsoever. And then just briefly, the district discusses the fact that there was no mention of the racial age and the Adams v. Oregon standard. And that its program was comprehensive. And regardless of its opinion regarding the comprehensive nature of the program, if the program, Your Honors, does not meet the unique needs of the child, you could be the most experienced, highly trained, highly qualified teacher with 50 years of experience teaching every child who is on the autism spectrum. But if you're not using the right techniques, that child's not going to learn. And in this case, the parents discovered the technique that worked for this child. The district even had it available in their district based on discussion with the district at IEP meetings and discussion later. And it wasn't used, it wasn't offered. So what we're requesting this court do, respectfully, is overturn the decision of the Administrative Lodgehood and the subsequent decision of the district court and find that the district did not properly implement the correct program. And that denied the child a fate for the 2004-2005 school year, 2005-2006 school year, and then order reimbursement. With respect to the child's disability, with respect to the final point, Your Honors, and I'll close regarding exhaustion, there was, this issue came up with respect, with regard to the, excuse me, can I get a drink of water? The issue came up sui sponte in witness testimony. Neither side had any reason to know that it did exist, this happens in trial. As Your Honors are aware, and the district did not have an opportunity to call witnesses and have them testify, and those witnesses were cross-examined regarding that issue. He missed roughly 25 percent of his entire resource program, this program that was, as Mr. Larson pointed out, comprehensive to address. Twenty-five percent of that was gone, and the district, even in their briefs, admits that they could not account for that, yet they say that they didn't have an opportunity to cross-examine or call witnesses. That did in fact happen, and it did happen during the trial. I was the attorney that represented the student during the trial. Thank you very much, and this matter is, or all matters, heard that the reporting is submitted. We'll recess until 9 a.m.
judges: Pregerson, Nelson, Singleton